IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 27, 2012

## JASON CLINARD v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Stewart County**
**No. 4-1650-CR-05     Robert E. Burch, Judge**

**No. M2011-01927-CCA-R3-PC - Filed December 17, 2012**

The Petitioner, Jason Clinard, appeals the Stewart County Circuit Court's denial of his petition for post-conviction relief from his conviction of first degree premeditated murder and resulting life sentence. On appeal, he contends that he was prejudiced by trial counsel's agreeing to transfer his case from juvenile to circuit court. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Clifford K. McGown, Jr., for the appellant, Jason Clinard.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Carey Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

Following a transfer from juvenile court, a jury convicted the Petitioner of first-degree premeditated murder. This court gave the following factual account of the crime in its direct appeal opinion:

> On March 2, 2005, the 14-year-old defendant shot and
> killed his school bus driver, Joyce Gregory, as she sat aboard the
> bus in front of his house. On the day before the shooting, the

victim had reported to the vice-principal of Stewart County High School, where the defendant was a freshman, that the defendant had been "dipping snuff on the bus." As a result of the victim's report, the defendant received "in-school suspension." The evidence established that the March 1, 2005 incident was not the first time the defendant had violated the school bus rules. He had previously been suspended from riding the bus for fighting and had only returned to riding the bus on February 25, 2005. According to the defendant's 16-year-old nephews, Joseph and Bobby Lee Fulks, the defendant believed that the victim was "picking on him" and he "didn't like [the victim] too much."

On the morning of the shooting, the defendant rose as usual, readied himself for school, and ate breakfast. As the three boys walked to the bus, the defendant insisted that the Fulks brothers board the bus ahead of him. As the brothers walked to the back of the bus, the defendant aimed a .45 caliber semi-automatic handgun and fired six jacketed hollow point bullets at the victim. Three shots struck the victim in the torso. The first shot entered the upper right side of the victim's back and exited through the upper left side of the back. The second shot struck the victim in the right side of her chest and traveled through her right lung, trachea, and left lung before coming to rest in the upper left side of her back. The third shot also struck the victim in the right side of her chest and then traveled through her right lung, spinal column, and aorta before becoming lodged in the periaortic tissue.

After being shot, the victim attempted to radio for help but succumbed to her injuries before she was able to do so. Meanwhile, the defendant ran around the back of his house and into the woods as Joseph Fulks went inside to telephone 9-1-1. After the victim's foot slipped from the brake, Bobby Fulks steered the bus toward a telephone pole to keep it from going over a steep hill. Bobby Fulks and other high school students helped the remainder of the children out of the emergency exit and into a nearby residence.

By the time the first police officer arrived on the scene, the victim had died. After the officer confirmed that the victim

was dead, he saw the defendant's father, Charlie Clinard, walking toward the bus. Mr. Clinard told the officer that the defendant had shot the victim and retreated to the woods behind the family residence. Officers later reached the defendant on his cellular telephone, and he agreed to surrender. Shortly thereafter, the defendant emerged from the woods carrying the .45 caliber handgun in one hand and the magazine in the other. He laid both on the ground and surrendered to the authorities.

State v. Jason Clinard, No. M2007-00406-CCA-R3-CD, 2008 Tenn. Crim. App. LEXIS 715, at **2-4 (Nashville, September 9, 2008). After a sentencing hearing, the trial court sentenced the Petitioner to life in confinement. Id. at *4. On appeal, the Petitioner argued that the trial court erred by not suppressing photographs of the victim, allowing the State to conduct an independent psychological examination of the Petitioner, failing to disqualify the district attorney general's office, and following the statutory sentencing scheme for first degree murder. Id. at **1-2. This court affirmed the Petitioner's conviction and sentence. Id. at *20.

Subsequently, the Petitioner filed a timely petition for post-conviction relief, raising numerous claims of ineffective assistance of counsel.[1] The post-conviction court appointed counsel and scheduled an evidentiary hearing.

At the hearing, Jake Lockert, the Public Defender for the Twenty-Third Judicial District since 1998, testified for the Petitioner that his office was assigned to represent the Petitioner soon after the Petitioner's arrest. Lockert began investigating the case and preparing for the Petitioner's juvenile transfer hearing. He arranged for Dr. William Bernet,[2] a psychiatrist from Vanderbilt, to work with the Petitioner and arranged for two doctors from Middle Tennessee Mental Health Institute (MTMHI) to examine him. Lockert also talked with administrators at secured juvenile facilities and arranged for them to testify at the transfer hearing that the Petitioner easily could be treated as a juvenile in those facilities. Other witnesses were prepared to testify at the hearing that the Petitioner had no prior criminal history, that he was a model student involved in extracurricular activities, and that he had shown signs of extreme honesty. Based on Lockert's investigation, he thought he had an overwhelming case for not transferring the Petitioner's case out of juvenile court. He

---

[1]The only issue the Petitioner pursues on appeal relates to trial counsel's decision to waive the Petitioner's juvenile transfer hearing.

[2]Throughout the evidentiary hearing transcript, Dr. Bernet is referred to as "Dr. Burnett." However, we will spell his last name as it appears in the curriculum vitae he provided for the juvenile transfer hearing.

stated, "In my twenty-eight years I've never dealt with a juvenile that had so much evidence in his favor to keep him and be treated as a juvenile. The only factor I found that would weigh against him was just the crime itself."

Lockert testified that his staff spent more than three hundred hours working on the Petitioner's case. At some point, the Petitioner's family hired an attorney to replace the public defender. Lockert spoke with the Petitioner's new counsel and updated counsel on the proof Lockert planned to present at the transfer hearing. However, the Petitioner's new counsel never tried to obtain the Petitioner's file and never met with Lockert to discuss the case face-to-face. Lockert said that the "main battle" in the Petitioner's case was keeping it in juvenile court so that the Petitioner could receive treatment, be released at nineteen years old, and "get on with his life." In the event the Petitioner's case was transferred to adult court, Lockert was prepared to argue at trial that the Petitioner suffered from diminished capacity or was guilty of a lesser-included offense such as second degree murder or manslaughter. Lockert said he would have considered waiving the juvenile transfer hearing only if the State had agreed for the Petitioner to plead guilty to a lesser-included offense.

On cross-examination, Lockert testified that if the Petitioner's case was transferred to adult court, the Petitioner was going to be tried for first degree premeditated murder. Therefore, it was "paramount" to keep the Petitioner's case in juvenile court. Lockert described the facts of the crime as "terrible." Nevertheless, the Petitioner was a sympathetic defendant. Based on the Petitioner's past dealings with the victim, Lockert thought provocation existed. He acknowledged that the evidence showed the Petitioner wore a long jacket on the morning of the crime and fired six shots at the victim. However, Lockert would have argued at trial that the Petitioner had planned to kill himself, not the victim. Mental health experts had diagnosed the Petitioner with depression, which could have been treated through juvenile court programs. Lockert thought the Petitioner was a perfect candidate for rehabilitation. The Petitioner's young age also weighed in favor of his case remaining in juvenile court because there was still time for him to receive treatment in a juvenile facility.

Andrew Brigham, the Juvenile Court Judge for Stewart County, testified for the Petitioner that he appointed the public defender's officer to represent the Petitioner and that Jake Lockert was "very aggressive" in defending the Petitioner's case. At some point, the Petitioner's family hired a new attorney. Judge Brigham said that new counsel was "much more laid back" than Lockert, that new counsel was not aggressive, and the judge "had some concerns" about the quality of new counsel's representation. To the judge's knowledge, new counsel had handled primarily guardian ad litem cases and juvenile work and had never handled a murder case. Judge Brigham stated that he presided over the Petitioner's juvenile transfer hearing and that the alleged crime was "quite serious." However, he was prepared to consider all of the required factors before he made a decision about whether to transfer the

case to adult court.

Judge Brigham testified that on the day of the transfer hearing, Dr. Bernet testified first for the defense because the doctor had a prior engagement scheduled. Then the State presented its evidence in favor of transferring the case to circuit court. At some point, an in-chambers meeting occurred in which defense counsel recommended to the Petitioner that he agree to a transfer. Judge Brigham said, "Quite frankly the decision was surprising and I was caught off guard." He said he was surprised because defense counsel had not presented any witnesses other than Dr. Bernet. Judge Brigham said defense counsel recommended the transfer because defense counsel was concerned that "the record was developing" against the Petitioner. Judge Brigham also recalled that new counsel had mentioned "in an offhand way at some point during these proceedings" that the Petitioner could face the death penalty in adult court. However, pursuant to Tennessee Code Annotated section 37-1-134, the Petitioner would not have been eligible for the death penalty. Defense counsel may have had other reasons for recommending the transfer, but Judge Brigham did not remember them. He stated that at the time of defense counsel's recommendation, he had not yet made a decision as to how he would rule on the transfer. In particular, he was going to consider possible rehabilitation programs available to the Petitioner in juvenile court, the Petitioner's amenability to rehabilitation, and evidence showing the existence of premeditation. He stated, "There was a lot still I was going to weigh."

On cross-examination, Judge Brigham testified that probable cause as to whether the Petitioner had committed the act was "still somewhat in the air" when the Petitioner waived the remainder of the transfer hearing. Dr. Bernet was in favor of the Petitioner's case remaining in juvenile court. However, experts from MTMHI had concluded that the Petitioner was not committable. Judge Brigham had been expecting the defense to present testimony about programs that could rehabilitate the Petitioner and whether he could be rehabilitated by the time he turned nineteen years old. Judge Brigham said he was concerned about the Petitioner's being released from custody at nineteen because "we were dealing with a relatively short period of time." He acknowledged that the defense would have had to present overwhelming proof that the Petitioner could be rehabilitated before he would have decided not to transfer the case to circuit court. He acknowledged signing a transfer order, stating that all of the requirements of the juvenile transfer statute had been satisfied. He said that he probably would not have signed the order if he had not believed enough evidence existed to transfer the Petitioner's case to adult court.

On redirect examination, Judge Brigham testified that although he signed the transfer order, he did not have to make a decision to transfer the Petitioner's case to adult court because the Petitioner agreed to the transfer.

Agent Joe Craig of the Tennessee Bureau of Investigation testified for the State that the Petitioner shot the victim with a .45 caliber semi-automatic handgun and that the Petitioner obtained the gun from the home he shared with his parents. Agent Craig was present at the transfer hearing and was going to testify as the State's final witness. However, the hearing ended before he was called to testify. Agent Craig testified for the State at the Petitioner's trial. His testimony at the transfer hearing would have been the same as his trial testimony.

On cross-examination, Agent Craig testified that he had testified in many homicide cases and that he was present in the courtroom during the Petitioner's trial. When asked to give his opinion on the effectiveness of trial counsel's representation of the Petitioner, he stated, "I recall driving - leaving the courthouse having some concerns about the - possibly retrying this case."

On redirect examination, Agent Craig acknowledged that the Petitioner gave a statement in which he said he planned to kill the victim. The Petitioner loaded and concealed the weapon before he shot the victim.

In a written order, the post-conviction court found that trial counsel's performance was deficient because counsel should have "at least [attempted] to prevent the transfer using mental health testimony" and because counsel agreed to the transfer without receiving a "significant concession" from the State. Regarding prejudice, the post-conviction court noted that the only witness who testified for the Petitioner at the transfer hearing was Dr. Bernet, who did not find that the Petitioner suffered from a mental illness or serious emotional disturbance and did not think the Petitioner was committable. The post-conviction court addressed all of the factors set out by the juvenile transfer statute, Tennessee Code Annotated section 37-1-134, and concluded that there was no reasonable probability that the Petitioner would not have been transferred to adult court if all of the evidence had been presented during the transfer hearing.

## II. Analysis

The Petitioner claims that the post-conviction court properly found that trial counsel rendered deficient performance and that he established prejudice through the testimony of Jake Lockert and Judge Brigham. The State contends that the trial court erred by finding that trial counsel's performance was deficient because trial counsel, who did not testify at the hearing, could have made a strategic decision to waive the remainder of the transfer hearing. In addition, the State argues that the Petitioner has failed to establish prejudice because he cannot show that he would have avoided a transfer to adult court even if trial counsel had not agreed to the transfer.

-6-

To be successful in a claim for post-conviction relief, a petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Notably,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Juvenile courts have original jurisdiction over children who are alleged to be

delinquent. Tenn. Code Ann. § 37-1-134; see also Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006). Tennessee Code Annotated section 37-1-134(a) provides the circumstances under which a juvenile court shall transfer a juvenile accused of conduct that constitutes a criminal offense to adult court. For a child less than sixteen years old and charged with a certain offense, such as first degree murder, the child must be provided with notice and a hearing. Tenn. Code Ann. § 37-1-134(a)(1)-(3). The child is to be treated as an adult if the juvenile court finds that there are reasonable grounds to believe that (1) the "child committed the delinquent act as alleged"; (2) the "child is not committable to an institution as for the developmentally disabled or mentally ill"; and (3) the "interests of the community require that the child be put under legal restraint or discipline." Tenn. Code Ann. § 37-1-134(a)(4)(A)-(C). Moreover, Tennessee Code Annotated section 37-1-134(b) lists the following factors that the judge must consider in deciding whether to treat a juvenile as an adult.

(1) The extent and nature of the child's prior delinquency records;

(2) The nature of past treatment efforts and the nature of the child's response thereto;

(3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(4) Whether the offense was committed in an aggressive and premeditated manner;

(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

(6) whether the child's offense would be considered a criminal gang offense, as defined in § 40-35-121, if committed by an adult.

Regarding the first prong of the Strickland test, the post-conviction court determined that trial counsel rendered deficient performance because he should have attempted to prevent the transfer using mental health testimony and advised the Petitioner to agree to the transfer without seeking any concessions from the State. The State contends that the post-conviction court erred by finding deficient performance because counsel made a strategic or

tactical decision to recommend waiving the transfer hearing. The State also argues that because neither the Petitioner nor trial counsel testified at the evidentiary hearing, the Petitioner cannot show that trial counsel's strategic or tactical decision was unreasonable.

Turning to the instant case, we initially note that at the beginning of the post-conviction evidentiary hearing, the State announced that it may call trial counsel to testify and that a subpoena had been issued for him. However, the State never called trial counsel as a witness. "We have observed on many occasions that original counsel, when available, should always testify in a post-conviction proceeding when there is an allegation that he was ineffective." State v. Hopson, 589 S.W.2d 952, 954 (Tenn. Crim. App. 1979). Moreover, "the state should present the attacked counsel to show what occurred." State v. Craven, 656 S.W.2d 872, 873 (Tenn. Crim. App. 1982); Garrett v. State, 530 S.W.2d 98, 99 (Tenn. Crim. App. 1975). We are puzzled as to why the State did not call trial counsel to testify about his recommendation that the Petitioner waive the remainder of the transfer hearing.

In any event, Dr. Bernet testified for the Petitioner at the transfer hearing, and the Petitioner's psychological evaluation from MTMHI was introduced into evidence. However, Judge Brigham testified that he had not made up his mind about whether to transfer the Petitioner's case, that he was waiting for the defense to present testimony about programs that could rehabilitate the Petitioner, and that he was caught off guard by defense counsel's decision to waive the hearing. Jake Lockert testified that he had arranged for administrators at secured juvenile facilities to testify at the transfer hearing that the Petitioner easily could be treated. Nevertheless, trial counsel made no attempt to show that the Petitioner should remain and be treated in juvenile facilities.

Regarding the State's claim that trial counsel made a strategic decision to waive the hearing, we recognize that possible reasons to waive a juvenile transfer hearing include the desire to have a bond set or the possibility that a voluntary transfer might increase the chances of a favorable plea offer from the State. See, e.g., James Clark Blanton, III v. State, No. M2001-02421-CCA-R3-PC, 2003 Tenn. Crim. App. LEXIS 661, at *16 (Nashville, July 30, 2003). On the other hand, in Mozella Newson v. State, a case involving a fourteen-year-old accused of carjacking, robbing, and kidnapping two victims, this court stated the following with regard to trial counsel's "strategy" in failing to present available evidence at the defendant's juvenile transfer hearing:

> The proof at the hearing established that the Appellant was
> fourteen years old, had no prior history of delinquency, attended
> the eighth grade, and was not a disciplinary problem at her
> school. We would agree that, because the Appellant conceded
> her presence during the crimes and because the State's proof

placed her at the scene with a gun which she used to accomplish serious crimes, the only viable strategy available to the Appellant was that of seeking adjudication as a juvenile. However, trial counsel failed to introduce any available evidence which could have precluded waiver of juvenile jurisdiction. Trial counsel explained that he made no attempt to introduce evidence because it would have been futile, as it would not have prevented transfer of the case in his opinion based solely on the egregious facts of the case. We must reject trial counsel's fatalistic reasoning. It is the obligation and duty of an attorney to represent a client zealously and to serve as an advocate within the bounds of the law. Tenn. R. Sup. Ct. 8, Canon 7. If evidence is relevant and germane to an issue, counsel should present the evidence and advocate for his client unless reasoned trial strategy dictates otherwise. Trial counsel's decision not to introduce evidence in this case was not based upon trial strategy. We can see no rationale or advantage to be gained by trial counsel's decision to forego the presentation of available evidence that the Appellant was amenable to disciplinary measures of the juvenile court, particularly, in a case such as this where the only viable strategy available was that of preventing transfer.

No. W2005-00477-CCA-R3-PC, 2006 Tenn. Crim. App. LEXIS 401, at **18-19 (Jackson, July 11, 2006).

Once again, we are perplexed that the State did not have trial counsel testify at the hearing. Obviously, the Petitioner received no benefit from agreeing to the transfer. Therefore, we are left to conclude that the only viable strategy in this case was to prevent the transfer and agree with the post-conviction court that trial counsel's failure to present mental health testimony at the transfer hearing resulted in deficient performance.

Regarding the second prong of Strickland, the post-conviction court concluded that the Petitioner failed to show he was prejudiced by counsel's deficient performance because he failed to demonstrate that, had counsel not advised him to waive the transfer hearing, there would have been no transfer. Again, we agree with the post-conviction court.

The Petitioner has included the transcript of the juvenile transfer hearing in the appellate record. At the hearing, Dr. Bernet testified for the Petitioner that he evaluated the Petitioner in 2005 and diagnosed him with severe depression, intermittent explosive disorder,

-10-

and attention deficit hyperactivity disorder (ADHD). All of the conditions were treatable in juvenile facilities. Dr. Bernet stated that the Petitioner's receiving long-term residential psychiatric treatment until he was nineteen years old "should be long enough certainly to address his psychiatric issue." The Petitioner's genetic makeup made him more susceptible to stress, which caused him to be depressed and suicidal. Dr. Bernet concluded that the Petitioner was not insane at the time of the crime, was competent, and was not committable. The Petitioner received As and Bs in school but had been in a few fights prior to his shooting the victim. He did not abuse drugs and had not been involved with a gang.

Dr. Kimberly Stalford, a psychiatrist, testified for the State at the transfer hearing that she reviewed the Petitioner's medical records from MTMHI and Dr. Bernet's reports. She stated that she questioned the severity of the Petitioner's depression and that his depression was treatable. The Petitioner's genetic predisposition for stress, however, could not be treated. Dr. Stalford concluded that the Petitioner planned to kill the victim. She said that the Petitioner had a long history of "acting out" and violent behavior and that his history of violence was the best predictor for his future use of violence.

The parties introduced into evidence the Petitioner's evaluation from MTMHI. According to the evaluation, the Petitioner was not eligible for involuntary commitment. Several additional witnesses, including police officers and one of the Petitioner's nephews present at the time of the shooting, testified for the State about the facts of the case.

The post-conviction court concluded that the evidence presented at the transfer hearing was more than sufficient to show that the Petitioner committed the delinquent act as alleged. The post-conviction court also concluded, based on the limited mental health evidence presented at the transfer hearing, that the Petitioner was not committable to an institution for the developmentally disabled or mentally ill. Next, the post-conviction court addressed whether the interests of the community required that the Petitioner be put under legal restraint or discipline. In making that determination, the post-conviction court noted that although the Petitioner had no prior record of delinquency and there had been no past efforts to treat him, he had been disciplined for fighting in school. The court also noted that the Petitioner committed a crime against a person, which received greater weight in favor of transfer than a crime committed against property, and that the offense was committed in an aggressive and premeditated manner. The court noted that Dr. Bernet testified that the Petitioner could be successfully treated by the time he was nineteen years old. However, Dr. Stalford doubted that the Petitioner could be successfully treated at all. Finally, the court noted that there was no proof the Petitioner's conduct was a criminal gang offense. Considering all the factors, the post-conviction court concluded that "there is no reasonable probability that Petitioner would not have been transferred to adult court had all of the evidence been presented to the juvenile court."

-11-

The Petitioner argues that the testimony of Jake Lockert, who testified about the proof he developed for the transfer hearing, and Judge Brigham, who testified that the issue of transfer was very much in doubt when counsel agreed to waive the hearing, established that he was prejudiced by counsel's deficient performance. However, the post-conviction court considered all of the evidence presented at the transfer hearing, considered all of the evidence presented at the evidentiary hearing, and addressed all of the factors set out in the juvenile transfer statute. The Petitioner did not present any additional evidence at the evidentiary hearing to address those factors. Therefore, we conclude that the Petitioner has failed to establish that but for counsel's deficient performance, his case would not have been transferred from juvenile court to adult court.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

 

 

_____
NORMA McGEE OGLE, JUDGE